UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
JOSEPH LEE,
               Plaintiff,

     v.

YELENA KOROBKOVA, Facility Health Service
Director; JUDITH CAMARA, Nurse; EVE M.
SIMMONS, Senior Offender Rehabilitation
Coordinator; ARIEL ESCOBAR, Senior Offender
Rehabilitation Coordinator/Chairman; DIANE
HINTON, Facility's Nurse Administrator; SAI
GANDHAM, Medical Doctor, Eye Specialist;
WILLIAM F. KEYSER, Superintendent; and ALEX
TROLENBERG, M.D.,
               Defendants.
--------------------------------------------------------------x

**OPINION AND ORDER**

20 CV 10311 (VB)

Briccetti, J.:

    Plaintiff Joseph Lee, proceeding pro se and in forma pauperis, brings this action against several employees of the New York State Department of Corrections and Community Supervision ("DOCCS") and medical providers from whom he received treatment during his incarceration at Sullivan Correctional Facility ("Sullivan").

    Plaintiff alleges defendants violated his Eighth Amendment rights by denying him adequate medical care in connection with a purportedly botched eye surgery and post-surgery complications, rendering him blind in that eye. Plaintiff also claims defendants denied his request for reasonable accommodations for his alleged blindness in violation of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"), and in retaliation for filing at least one grievance related to his medical treatment.

    Now pending is defendants' unopposed[1] motion for summary judgment (Doc. #36).

---

[1] By Orders dated May 17, 2022 (Doc. #45), August 8, 2022 (Doc. #46), and August 30, 2022 (Doc. #50), the Court gave plaintiff nearly seven months to respond to the motion. In the

For the reasons set forth below, the motion is GRANTED.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

Defendants have submitted a memorandum of law, a statement of undisputed material facts pursuant to Local Civil Rule 56.1, and supporting declarations and exhibits, which together reflect the following factual background.

---

August 30 Order, the Court informed plaintiff he would not be granted a further extension of time to oppose the motion absent compelling circumstances. (Doc. #50). Nevertheless, plaintiff failed to oppose the motion by the final deadline of November 8, 2022. Thus, by Order dated November 23, 2022, the Court deemed the motion fully submitted and unopposed. (Doc. #56 (the "November 23 Order")).

On December 19, 2022, plaintiff filed a notice of appeal seeking to "revers[e] the Nov. 23rd, 2022, decision of the S.D.N.Y. Judge (Vincent L. Briccetti) denying Petitioner/Plaintiff's Medical Malpractice Claims by granting defendants' motion for summary judgment." (Doc. #57 at ECF 7). However, the November 23 Order was not an appealable order (nor did it grant defendants' motion for summary judgment, contrary to plaintiff's assertion). As the Order did not "conclusively determine all pending claims," it is not a final order appealable under 28 U.S.C. § 1291. See Smurphat v. Hobb, 822 F. App'x 44, 45 (2d Cir. 2020) (summary order). Moreover, the November 23 Order does not fall within any recognized category of appealable non-final orders. See id.

In any event, "the filing of a notice of appeal only divests the district court of jurisdiction respecting the questions raised and decided in the order that is on appeal." N.Y. State Nat'l Org. for Women v. Terry, 886 F.3d 1339, 1350 (2d Cir. 1989). As such, the Court retains jurisdiction to decide the merits of defendants' motion for summary judgment, which involves questions that were not "raised and decided" in the November 23 Order. See Bottone v. United States, 2012 WL 717235, at *1 n.2 (S.D.N.Y. Mar. 5, 2012) (deciding plaintiff's motion for reconsideration notwithstanding plaintiff's filing of a notice of an appeal from a related district court order).

Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations. Plaintiff will be provided copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009) (per curiam).

I.  Plaintiff's Medical Care[2]

On February 1, 2019, a nurse practitioner at Sullivan referred plaintiff to defendant Dr. Sai Gandham, an ophthalmologist under contract with DOCCS, for surgery to remove a cataract from plaintiff's left eye.[3]  Dr. Gandham scheduled the surgery for April 15, 2019, and prescribed several medicated eye drops to prepare plaintiff's eye for surgery, prevent infection, and promote healing after surgery.  Dr. Gandham performed the surgery on April 15, 2019, with no documented complications, and plaintiff was transported to the recovery room in stable condition.

The following day, Dr. Gandham saw plaintiff for a post-operative appointment.  Dr. Gandham assessed plaintiff's left eye, measuring his visual acuity at 20/40 in both eyes, and noted plaintiff "denie[d] any pain or discomfort" in his left eye.  (Doc. #39-2 ("Gandham Records") at 11).  During this visit, Dr. Gandham prescribed anti-inflammatory and antibacterial eye drops and advised plaintiff to return for a second post-operative appointment in a week.

On April 29, 2019, Dr. Gandham saw plaintiff for the second post-operative appointment.  Dr. Gandham assessed plaintiff's vision and did not observe any complications.  He advised plaintiff to return in two to three weeks.

On April 30, Dr. Gandham, in coordination with defendant Dr. Yelena Korobkova, the facility health services director at Sullivan, scheduled a third post-operative appointment for June 21, 2019.  However, on June 13, 2019, Dr. Gandham was informed plaintiff would be treated at

---

[2]  Defendants submitted voluminous medical records describing care provided to plaintiff both at DOCCS facilities and by private, external medical providers.  The Court summarizes only those facts relevant to the named defendants and plaintiff's alleged eye injuries in this action.

[3]  The same surgery had been performed on plaintiff's right eye in January 2018.

3

the prison clinic and plaintiff's June 21 appointment with Dr. Gandham was cancelled.  Plaintiff did not see Dr. Gandham after his April 29 appointment.

On August 26, 2019, Dr. Korobkova referred plaintiff for an ophthalmologist appointment at Coxsackie Correctional Facility.  Plaintiff presented for the appointment on August 28, but the ophthalmologist did not show up.

Thus, the next day, Dr. Korobkova sent plaintiff to the emergency room at Albany Medical Center ("AMC").  Plaintiff was seen by a triage nurse eleven minutes after he arrived, and then by defendant Dr. Alex Trolenberg, a medical resident.

Plaintiff informed Dr. Trolenberg he had experienced eye redness, vision loss, and purulent drainage since his surgery in April, and that he had "been using antibiotic eye drops for four weeks with no improvement."  (Doc. #39-4 ("AMC Medical Records") at 20).  Dr. Trolenberg determined plaintiff was already prescribed anti-inflammatory, antibiotic, and steroidal eye drops.  Dr. Trolenberg examined plaintiff and noted "the left eye . . . movement was intact, pupils were equally round and reactive to light."  (Doc. #39-3 ("Trolenberg Decl.") ¶ 8).  He diagnosed plaintiff with acute conjunctivitis.

Dr. Trolenberg ordered an ophthalmology consultation.  The ophthalmologist performed a full eye exam and agreed with Dr. Trolenberg's diagnosis.  The ophthalmologist noted plaintiff's slit-lamp eye examination was "unremarkable" and recommended "artificial tears . . . for comfort, hand hygiene, [and] cold compresses" to treat plaintiff's conjunctivitis.  (AMC Medical Records at 38).  The ophthalmologist also observed that plaintiff blinked when there was a threat to the eye and complained the slip lamp light was too bright when shined in his left eye—reactions "which would be highly unlikely" in the event of vision loss.  (Id.)  The

4

ophthalmologist further indicated plaintiff's "story change[d]" several times during testing, and the exam revealed nothing that would explain plaintiff's claim of "profound vision loss." (Id.)

Dr. Trolenberg and the ophthalmologist recommended plaintiff "should continue eyedrop medications as prescribed and can be discharged back to jail" because there was "no concern for intraocular or orbital infection." (AMC Medical Records at 26). Accordingly, after advising plaintiff that hygiene was very important to his recovery, Dr. Trolenberg discharged plaintiff in stable condition from AMC on the night of August 29, 2019. (Id. at 27; Trolenberg Decl. ¶¶ 10, 12).

On September 8, 2019, plaintiff was seen at the Sullivan medical clinic by defendant Judith Camara, a nurse. During that visit, plaintiff complained the medication for his eyes was not working and demanded to see a doctor. Nurse Camara noted that "[p]er chart review . . . Inmate has not been coming for eye medication twice a day as directed," and that plaintiff had been told to come to the clinic that morning. ((Doc. #39-5 ("DOCCS Medical Records") at 26). Camara reminded plaintiff it was important for him to come twice a day for the medication.

On September 23, 2019, plaintiff came to the clinic, complaining of pus in his eyes. He was seen by Nurse Camara, who observed plaintiff's eyes were clear with "no drainage." (DOCCS Medical Records at 43). She noted plaintiff should return to the clinic as needed.

On September 25, 2019, plaintiff returned to the clinic, complaining his "eyes [were] still messed up." (DOCCS Medical Records at 43). He was again seen by Nurse Camara. This time, however, Camara observed yellow drainage from plaintiff's left eye, noted a risk of infection, and notified a doctor. Plaintiff was then admitted to the Sullivan infirmary, where he remained until October 2, 2019.

Plaintiff testified that on September 29, 2019, during his stay at the infirmary, Camara said plaintiff could "complain all [he] want[s], it's not going to do no good to" him.[4] (Doc. #39-10 ("Pl. Tr.") at 31, 36).[5] In his complaint, plaintiff alleges that, on October 16, 2019, plaintiff filed a grievance regarding Camara's comments. (Compl. at 4). He alleges defendant William Keyser, the Superintendent at Sullivan, denied his grievance because "grievant does not consistently go . . . to receive his . . . medication . . . as prescribed." (Id.) Plaintiff testified similarly during his deposition.

Plaintiff alleges in his complaint he filed a second grievance about Camara's comments in March or April 2020, which was denied because plaintiff "was appropriately quarantined due to [plaintiff] testing positive for COVID-19." (Compl. at 5). There is no evidence in the record of plaintiff's second grievance.

In his complaint, plaintiff also alleges that on October 8, 2020, Dr. Gandham recommended that Dr. Korobkova renew plaintiff's eye drop prescriptions, and Dr. Korobkova did not do so. (Compl. at 6–7). However, this allegation is not supported by plaintiff's medical records.

II.    Plaintiff's Accommodation Request

On July 24, 2020, plaintiff requested the following accommodations for visual impairment: a lamp, tape player, talking watch, hat, headphones, sunglasses for indoor use, large print, and magnifiers. (Doc. #39-7 ("Accommodation Request")).

---

[4]    Plaintiff also alleges Camara threatened to issue him a misbehavior report. (See Doc. #2 ("Compl.") at 4.) However, this allegation is not supported by plaintiff's deposition testimony describing Camara's statements.

[5]    Citations to "Tr. at _" refer to the page number at the top right-hand corner of each transcript page.

The same day, plaintiff's request was reviewed by defendant Diane Hinton, a Nurse Administrator, who determined there was no medical verification on file for plaintiff's request. (Accommodation Request at 2). Later that day, defendant Eve Simmons, an Offender Rehabilitation Coordinator, denied plaintiff's request, noting plaintiff did not meet the criteria for legal blindness or severe visual impairment—visual acuity of 20/70 or less "in better eye with correction." Id. As such, plaintiff did "not qualify for accommodation" pursuant to DOCCS Directive 2612 (the "Directive"), which, according to defendant Ariel Escobar, incorporates Title II of the ADA. (Id.; Doc. #39-6 ("Escobar Decl.") ¶ 4).[6]

On July 27, 2020, plaintiff sought superintendent review of the Accommodation Request. The next day, Escobar, a Supervising Offender Rehabilitation Coordinator, met with plaintiff to conduct the review. Escobar denied the Accommodation Request, agreeing with Simmons that plaintiff did "not qualify for the requested reasonable accommodation." (Accommodation Request at 3).

Escobar attested that plaintiff's medical records at the time indicated "he had infection of the eye, but not that he was blind or had severe visual impairment." (Escobar Decl. ¶ 5). He referred to an ophthalmologist who examined plaintiff on November 15, 2019, who noted plaintiff "complain[ed] of not seeing well out of . . . left eye[] because of 'pus' coming out of the eye." (DOCCS Medical Records at 57). Moreover, according to Escobar, none of the ophthalmologists indicated plaintiff's "underlying vision was gone or impaired to the standard in the Directive," as required to qualify for the requested accommodations. (Escobar Decl. ¶ 5).

---

[6] Although the Escobar Declaration purports to attach a copy of the Directive in effect when plaintiff filed the Accommodations Request, no such copy was attached, nor was the Directive otherwise submitted to the Court.

Plaintiff commenced this action on December 7, 2020, alleging defendants violated (i) the Eighth Amendment, by allegedly disregarding complications from plaintiff's surgery, denying the Accommodation Request, denying his grievance(s) regarding defendant Camara's comments, and exposing him to COVID-19; (ii) the ADA and Section 504, by denying the Accommodation Request; and (iii) the First Amendment, by allegedly retaliating against plaintiff for filing a grievance.

## DISCUSSION

I.  Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate.  Celotex

Corp. v. Catrett, 477 U.S. at 322–23.  If the non-moving party submits "merely colorable" evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011).  The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him.  Dawson v. Cnty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper.  See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

"Where, as here, a party has not opposed a motion for summary judgment, 'the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed.'"  Slep-Tone Entm't Corp. v. Golf 600 Inc., 193 F. Supp. 3d 292, 295 (S.D.N.Y. 2016) (quoting Jackson v. Fed. Express, 766 F.3d 189, 194 (2d Cir. 2014)).  Indeed, if a party has not opposed the motion, the Court may grant summary judgment only "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3).

In deciding a motion for summary judgment, the Court need consider only evidence that would be admissible at trial. Nora Bevs. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998). The burden to proffer admissible evidence applies "equally to pro se litigants." Varughese v. Mt. Sinai Med. Ctr., 2015 WL 1499618, at *4 (S.D.N.Y. Mar. 27, 2015) (citing Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001)). Accordingly, bald assertions, completely unsupported by admissible evidence, are not sufficient to defeat summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

II. Eighth Amendment Claim

Defendants argue the undisputed facts show plaintiff received constitutionally adequate medical care.

The Court agrees.

A. Legal Standard

Courts have construed the Eighth Amendment to protect prison inmates' rights to adequate medical care. See Estelle v. Gamble, 429 U.S. 97, 103–04 (1976). To prevail on a claim for inadequate medical care, plaintiff must show "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 106. This test has both an objective and a subjective component: the objective component requires a "sufficiently serious" deprivation of medical care, and the subjective component requires that the officials in question acted with a "sufficiently culpable state of mind." Salahuddin v. Goord, 467 F.3d 263, 279–80 (2d Cir. 2006).

The objective component has two subparts. First, plaintiff must show he "was actually deprived of adequate medical care," keeping in mind that only "reasonable care" is required. Salahuddin v. Goord, 467 F.3d at 279 (citing Farmer v. Brennan, 511 U.S. 825, 839–40 (1970)).

"Second, the objective test asks whether the inadequacy in medical care is sufficiently serious," by examining "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Id. at 280 (citing Helling v. McKinney, 509 U.S. 25, 32–33 (1993)).

To satisfy the subjective component, plaintiff must show defendants were aware of his serious medical needs and consciously disregarded a substantial risk of serious harm. Salahuddin v. Goord, 467 F.3d at 280. "[N]egligence, even if it constitutes medical malpractice, does not, without more," rise to the level of an Eighth Amendment violation. Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998). Likewise, "mere disagreement over the proper treatment does not create a constitutional claim," if "the treatment given is adequate." Id.; see also Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("[D]isagreements [between a prisoner and prison officials] over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention . . . implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.").

B. Analysis

Here, the undisputed facts show plaintiff received reasonable medical care, and no defendant consciously disregarded a substantial risk of serious harm to plaintiff. Therefore, a reasonable jury could not find for plaintiff on his Eighth Amendment claim.

1. Surgery and Subsequent Medical Treatment

Plaintiff asserts an Eighth Amendment claim against Dr. Gandham, Dr. Trolenberg, Dr. Korobkova, and Nurse Camara (the "Care Provider Defendants") premised on the medical treatment they gave him.

11

Dr. Gandham performed successful cataract surgery on plaintiff without any immediate complications.[7]  Dr. Gandham then treated plaintiff during two subsequent post-operative visits. During the post-operative visits, plaintiff was examined by Dr. Gandham, denied any pain or discomfort, was prescribed medicated eye-drops to facilitate his recovery, and was discharged in stable condition.

Dr. Trolenberg treated plaintiff over more than eight hours in the AMC emergency room. He conducted a physical examination and consulted with an ophthalmologist, who also examined plaintiff and agreed with Dr. Trolenberg's diagnosis of acute conjunctivitis.  Dr. Trolenberg spoke with plaintiff about his diagnosis and treatment and discharged plaintiff in stable condition.

Dr. Korobkova referred plaintiff to private medical providers and coordinated the scheduling of plaintiff's appointments, including sending plaintiff to the AMC emergency room after a doctor did not present for a scheduled appointment with plaintiff the prior day.  The timing of these external appointments and the circumstances that prompted them do not evidence a conscious disregard of any ailment plaintiff suffered.

Nurse Camara treated plaintiff on three occasions in September 2019:  On September 8, Camara advised plaintiff to use his eye medication (which, she noted, he had not been doing); on September 23, Camara examined plaintiff and observed his eyes were clear, with no discharge; and on September 25, Camara referred plaintiff to a doctor when she observed drainage coming from his left eye.  These facts show Camara provided reasonable medical care based on plaintiff's situation and did not act with conscious disregard of any risk to plaintiff's health.  Nor

---

[7] Plaintiff's assertion that Dr. Gandham "botched" the surgery (Compl. at 7) is not supported by the record.

is such disregard established by plaintiff's testimony that Camara said plaintiff could "complain all [he] want[s], it's not going to do no good." (Pl. Tr. at 31, 36).

Thus, based on the undisputed material facts, the Care Provider Defendants were not deliberately indifferent to plaintiff's medical needs. To the contrary, the record reflects they acknowledged and reasonably treated plaintiff's medical complaints with regularity and attentiveness. The Eighth Amendment requires nothing more.

Accordingly, summary judgment must be granted on plaintiff's Eighth Amendment claim as to Dr. Gandham, Dr. Trolenberg, Dr. Korobkova, and Nurse Camara.

2. Denial of the Accommodation Request

Plaintiff also asserts an Eighth Amendment claim against Simmons, Escobar, and Hinton premised on their denial of the Accommodation Request.

Even if the denial of plaintiff's requested accommodations constituted a sufficiently serious deprivation of medical care, the record shows these defendants acted with a sincere belief that plaintiff did not qualify as severely visually impaired under DOCCS's policy. There is no indication in plaintiff's medical records that he met the criteria under the Directive, i.e., that his visual acuity was 20/70 or less in his good eye with corrective lenses. (Escobar Decl. ¶ 4). "[T]he absence of a sufficiently culpable state of mind" may be inferred if "the defendant denied the plaintiff medical treatment because the defendant sincerely and honestly believed that applying a prison policy mandating the denial of treatment was, in plaintiff's case, medically justified." Salahuddin v. Goord, 467 F.3d at 281. Thus, plaintiff has not raised a triable issue of fact that Simmons, Escobar, or Hinton consciously disregarded a substantial risk of serious harm to plaintiff.

Accordingly, summary judgment must be granted on plaintiff's Eighth Amendment claim as to Simmons, Escobar, and Hinton.

### 3. Denial of Plaintiff's Grievance

Plaintiff's claim that Superintendent Keyser denied plaintiff's grievance(s) regarding Nurse Camara's comments, standing alone, is insufficient to raise a triable issue of fact that Keyser acted with deliberate indifference towards plaintiff's medical needs.

Accordingly, to the extent plaintiff asserts an Eighth Amendment claim against Keyser, summary judgment must be granted.

### 4. COVID-19 in Sullivan

In his complaint, plaintiff alleges unnamed officials at Sullivan brought COVID-19 into the facility by failing to wear proper personal protective equipment. However, the undisputed facts do not suggest any defendant engaged in this conduct. To establish a defendant's individual liability in a suit under Section 1983, a plaintiff must show the defendant was directly and personally involved in the alleged constitutional deprivation. See Tangreti v. Bachmann, 983 F.3d 609, 616 (2d Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)). Plaintiff has failed to do so here.

Accordingly, summary judgment must be granted on plaintiff's Eighth Amendment claim premised on unspecified Sullivan officials bringing COVID-19 into Sullivan.

## III. ADA and Section 504 Claims

Defendants argue they are entitled to summary judgment on plaintiff's ADA and Section 504 claims because a reasonable jury could not conclude, based on the record before the Court, that plaintiff is a qualified individual with a disability under either statute.

The Court agrees.

A.      Legal Standard

Title II of the ADA provides, in relevant part, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Likewise, Section 504 provides, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

"[A]lthough there are subtle differences between these disability acts, the standards adopted by Title II of the ADA for State and local government services are generally the same as those required under section 504 of federally assisted programs and activities," and thus courts typically "treat claims under the two statutes identically." Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003).

To prevail under either statute, a plaintiff must show: "1) he is a qualified individual with a disability; 2) DOCCS is an entity subject to the acts; and 3) he was denied the opportunity to participate in or benefit from DOCCS's services, programs, or activities or DOCCS otherwise discriminated against him by reason of his disability." Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 72 (2d Cir. 2016).

Regarding the first prong, the ADA and Section 504 define "disability" as "a physical or mental impairment that substantially limits one or more major life activities," including seeing, walking, and reading. 42 U.S.C. § 12102; 29 U.S.C. § 705(20)(B). "The ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity." 42 U.S.C.

§ 12102(4)(E)(ii).  An individual with a disability is "qualified" for purposes of either statute if he or she, with or without reasonable modifications, meets the essential eligibility requirements for the receipt of services or the participation in such programs or activities.  42 U.S.C. § 12131(2) (ADA); 45 C.F.R. § 84.3(l) (Rehabilitation Act).

Regarding the second prong, both the ADA and Section 504 apply to state prisons and their prisoners.  See Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 213 (1998); Wright v. N.Y. State Dep't of Corr., 831 F.3d at 72.

Regarding the third prong, discrimination "can include failure to make a reasonable accommodation for the inmate."  McFadden v. Noeth, 827 F. App'x 20, 28 (2d Cir. 2020) (summary order).  A plaintiff asserting a claim based on a failure to provide reasonable accommodations must establish he or she "as a practical matter was denied meaningful access to services, programs or activities to which he or she was legally entitled."  Wright v. N.Y. State Dep't of Corr., 831 F.3d at 72.

B.  Analysis

Based on the record here, a reasonable jury could not find that plaintiff is a qualified individual with a disability under the ADA or Section 504 or that he was denied meaningful access to DOCCS programs or services.[8]

First, the undisputed material facts indicate plaintiff suffered from an eye infection that caused him itching, redness, swelling, and discharge from both eyes.  Although the Court is sympathetic to the discomfort plaintiff has endured, doctors who examined plaintiff consistently

---

[8]  Because the Court concludes plaintiff has failed to establish a prima facie claim under either Title II of the ADA or Section 504, it does not address whether the Eleventh Amendment bars plaintiff's claims for money damages against the individual defendants in their official capacities.  See Dean v. Univ. at Buffalo Sch. of Med. & Biomed. Scis., 804 F.3d 178, 193 (2d Cir. 2015).

determined he was not suffering from the vision loss of which he complained. For example, the ophthalmologist who examined plaintiff on November 15, 2019, recorded plaintiff's vision as 20/40 in one eye and 20/400 in the other and noted plaintiff complained of difficulty seeing out of his left eye due to "pus coming out of the eye." (DOCCS Medical Records at 57). Based on this examination and records from other ophthalmologists who examined plaintiff, defendants concluded "he had infection of the eye, but not that he was blind or had severe visual impairment." (Escobar Decl. ¶ 5).

Even if the Court assumes plaintiff's acute conjunctivitis qualified as a physical impairment under the ADA or Section 504, the record does not support a conclusion that the infection was sufficiently severe to qualify as a disability. See Dancause v. Mount Morris Cent. Sch. Dist., 590 F. App'x 27, 28 (2d Cir. 2014) (summary order) (affirming dismissal when plaintiff did not plausibly allege her periodontal disease "substantially limited" her major life activities, and therefore failed to show she was disabled under the ADA). Thus, plaintiff has failed to raise a question of material fact that he is a qualifying individual with a disability.

Regardless, even if plaintiff had presented evidence that he was disabled, defendants would still be entitled to summary judgment on plaintiff's ADA and Section 504 claims because plaintiff has failed to raise a genuine issue of material fact that he was denied "meaningful participation in prison activities and programs." Wright v. N.Y. State Dep't of Corr., 831 F.3d at 72. The undisputed facts do not identify any prison program or service which plaintiff was unable to access because of his purported disability (or lack of accommodations). Therefore, a reasonable juror could not conclude, based on the record before the Court, that defendants' denial of the Accommodation Request deprived plaintiff of the opportunity to meaningfully access programs and services at Sullivan.

Accordingly, summary judgment must be granted on plaintiff's ADA and Section 504 claims.

IV.     First Amendment Retaliation Claim

Plaintiff claims defendants Simmons, Escobar, and Hinton denied the Accommodation Request in retaliation for plaintiff filing a grievance against Nurse Camara.[9]

The Court disagrees.

To prove a retaliation claim under the First Amendment, "a prisoner must demonstrate the following: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004).

Regarding the first element, filing a prison grievance is protected conduct. See Dolan v. Connolly, 794 F.3d 290, 292 (2d Cir. 2015).

Regarding the second element, "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." Nelson v. McGrain, 596 F. App'x 37, 38 (2d Cir. 2015) (summary order) (quoting Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003)).

Regarding the third element, "[a]n inmate bears the burden of showing that the protected conduct was a substantial or motivating factor in the prison officials' . . . decision" to take adverse action. Holland v. Goord, 758 F.3d 215, 225 (2d Cir. 2014). "The defendant official then bears the burden of establishing that the [adverse] action would have occurred even absent the retaliatory motivation." Id.

---

[9]     Defendants do not address this claim in their motion papers.

18

Courts "look to the specific circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." Hayes v. Dahlke, 976 F.3d 259, 272 (2d Cir. 2020). Moreover, in view of "the ease with which claims of retaliation may be fabricated, [courts] examine prisoners' claims of retaliation with skepticism and particular care." Id.

Even assuming plaintiff established the first two elements, he failed to show a causal connection between his filing of the grievance and defendants' denial of the Accommodation Request. Rather, the undisputed facts indicate Simmons, Escobar, and Hinton denied plaintiff's request because he did not meet DOCCS criteria for a severe visual impairment. There is no evidence defendants Simmons, Escobar, or Hinton were aware of plaintiff's grievance or that it was "a substantial or motivating factor" in their decision to deny the Accommodation Request. Hayes v. Dahlke, 976 F.3d at 272.

Accordingly, summary judgment must be granted on plaintiff's First Amendment retaliation claim.

**CONCLUSION**

Defendants' motion for summary judgment is GRANTED.

The Clerk is instructed to terminate the motion (Doc. #36) and close this case.

Chambers will mail a copy of this Opinion and Order and all unpublished decisions to plaintiff at the address on the docket.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v United States, 369 U.S. 438, 444–45 (1962).

Dated: March 8, 2023
White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge